Please be seated. Our final case of the day is Covol Fuels v. Pinnacle Mining Company. Mr. Flaherty, good to have you here, sir. Thank you, Your Honor. It's good to be here. Court, please. I am Tom Flaherty, and I represent the appellant, Covol Fuels No. 4, LLC. This is a coal mining contract dispute, and we appeal from the granting of summary judgment in favor of the defendant by Judge Berger last April, about two weeks before trial. The central issue before the court is whether or not Pinnacle, the defendant, was obligated to lower water levels and provide my client, Covol, access to coal finds in Pinnacle's impoundment under the party's contract and also pursuant to Pinnacle's own mine plan. For those of you not familiar with coal mining operations, this is sort of a secondary mining as a result of a deep mine operation. Pinnacle operates a deep mine. They mine coal that comes out with dirt, rock, what have you. That goes to a preparation plant, a cleaning plant, where the sellable coal is separated, and then the byproduct is pumped off into a large man-made impoundment or pond. This one was about 10 acres, was huge. And when they pump that rock and dirt and what have you, there are still coal finds or small pieces of coal that come with it that settle into the pond. The contract between Pinnacle and Covol was to go back in and mine that pond. And that's done with a floating dredge that reaches down and mines the coal. We did that. It was profitable. But it required, under the mine plan, once we finished one layer, or lifts, as the AMCHA calls it, you would have to lower the water in the impoundment to get down to the next layer. Where in the agreement does it say that Pinnacle, where does it say anything about water level in the agreement? Judge, the contract, what the parties call the CIPRA, the Coal Purchasing Refuge Recovery Act, does not specifically say that they have to lower the water. What it does say is that they must maintain all the applicable mine permits, which is governed by both AMCHA and the West Virginia DEP. Those mine permits specifically referred to the lowering of water levels. Every nuance of this mining operation, both Pinnacles and Covol, was subject to very tight controls by AMCHA and the West Virginia DEP. Those mine permits have force and effect of law? Judge, we believe they do. If you don't comply with them, you can be cited for a violation of the suit? Oh, absolutely. Absolutely they have the force and effect of law. I mean, the entire operation is governed by those permits. As long as you don't comply with them, you can be indicted. It's a criminal offense. That's exactly right. We believe that those mine plans are part of the contract. Judge Floyd, you were right, and we will concede that the words lowering the water level are not in what we call the CIPRA, that Coal Purchase Refuge Recovery Agreement. But we believe that they are incorporated by reference to them in the contract itself that says that the CIPRA and its terms include that they will maintain existing permits that are required for its performance under the contract, under the agreement. Those are the permits. Those permits in multiple places talk about mining it at these lifts or layers of 25 feet. What specific section are you relying on? Section of the CIPRA, Judge? Yes. Well, the portion of it that has the language, the terms that they will maintain existing permits that are required for its performance under the agreement. And which section is that? You don't have the section number? I'm sorry, Judge Davis, I don't have that in my notes. I believe that is set out in the briefs. But there's- Is it section seven? Section eight? Yeah. Yeah. I'm sorry. You're right. It is. It's section seven and eight. Seven and eight? Yes, sir. The mine plan is incorporated by reference into the CIPRA at both section seven and eight that require the impoundment to be mined in the successive 25-foot lifts. And you drew the district court's attention to section seven as well as section eight? Judge, it was in the briefs. We never had oral arguments on this. We requested oral arguments to the court, and the ruling was made, much to our surprise, without having the opportunity to orally argue. It's a- You had a right-of-way provision in there, too, didn't you? We did, Judge King. And we believe that right-of-way provision talks about or encompasses going all the way to the finds themselves, clear to the bottom of that pond. It doesn't say whether it goes underwater or stays above water. It does not. They say it stops at the water's edge. Yeah, but which makes no sense. And you say it goes to wherever the finds are. Exactly. And- So you have to say that's section 18. So you have to argue that section 18 is ambiguous, then, and creates a question of fact for a jury? Exactly. Exactly. This- Or you read into it, under their view, that the right-of-way to the finds or the removal, the refuge materials, that's how it's defined in an agreement, isn't it? Right. Yes, sir. That the refuge material in the impoundment, the right-of-way to the refuge material stops at the water's edge. Right. Which we believe makes absolutely no sense. Yes, sir. Is that in the Gondot River- It's in Wyoming County. It's in Wyoming County. Yes, sir. But it's the headwaters up there of- does it all go to the Gondot River? That I couldn't tell you, Judge King. This 10-acre impoundment goes in- there's a towpond that they pump into. A couple hundred feet deep? Yes, sir. And it's- A thousand feet wide? About 10 acres. A mile long? Yep. It's a big piece of water. Indeed, it is. Those things have been dangerous over there in West Virginia. They have. We learned that in Buffalo Creek. But certainly, the view that you just expressed is a reasonable meaning in our view, and this court has held in the Goodman case- That's not necessarily the only reasonable meaning. Right. Exactly. There are a variety of reasons that we believe the summary judgment should not have been that you have to read into the contract exactly what the terms provide, and that is they've got a mind by the mine plans, which specifically calls for these 25-foot successive lists. At the summary judgment stage, COVOL is entitled to all justifiable inferences, and we didn't get any inferences. That seems to me turns on the intent of the parties, and the West Virginia Supreme Court says those inferences turn on the intent of the parties in the energy development versus Moss case that is cited in the briefs. We believe that, and this court has held, that a contract is ambiguous if it is reasonably susceptible to different meanings, and this court said that in the Goodman case in 1993, I believe it was, and in that case, the court specifically said the court can consider extrinsic evidence if genuine issues regarding contract interpretation exist and summary judgment must be refused. The specific quote is that contract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless. What's the relevance here of this selenium content in that impoundment? Does that have any pertinency to the summary judgment? I believe it's a red herring, a red herring. That was their excuse for not lowering the water. They said that they had a selenium problem in the mine that came up after they had entered into the contract with us. In order to deal with that selenium problem, they chose what was called a closed-loop system that would keep water in that pond so that it couldn't lose it. They couldn't lower the water levels. That was their argument. Because that would stir up the selenium more? I'm not sure, the engineering judge. But that was their... But they raised it. They did. You're saying that didn't have anything to do with it at this stage? I don't believe it does, and we don't believe it does. They had the selenium problem, again, came up after the parties entered into the SIPRA. In trying to determine how they were going to deal with that, they hired a company by the name of Barr, and it's referred to in the briefs. Barr did their first report and recommendation to Pinnacle on how to deal with the selenium, and they chose a system that would still allow us to lower the water in the pond. Pinnacle came back to Barr and somehow talked them into backing off that opinion, and the final Barr report was such that they developed this closed-loop system, notwithstanding the fact that there were other alternatives that Pinnacle themselves have used in other mines. What about Section 20's provision disclaiming any warranty about the suitability of the project? Judge, I don't think that's what we're here to talk about either. That deals with the quantity and quality of the coal that's there, and . . . Refugee material? Yes, sir. Whether or not there's an entering into this country . . . Well, it's a good part of the coal. It is. They've always been throwing it away. Exactly. I mean, it's been thrown away too much. It was probably 50 years ago. I don't know how long this thing's been up here on the mountain, but it's been thrown away. It's been thrown away a long time ago. They dig it out now and use it for, what, manufacturing tires or something? And it's very profitable. And Coval made a profit on this. It's black or something. But that section just deals with quality and quantity, and there are no warranties representations there. We're arguing about that. What we're saying is that you have to infer into the agreement of the parties the fact that they were going to comply with the M-SHIP plans and govern every nuance of the mining operations of Pinnacle and Coval. And when you look at the record, there are multiple references to documents and deposition testimony that I can cite to the court where they talk about that they have to comply with the lower in the water. The . . . In Joint Exhibit 1389-90, Flagle says we could adopt the closed-loop system if we didn't have to adjust the water level for Coval. But since we agreed to do that, the closed-loop system wasn't going to work. That's when it ultimately came back and was used anyway. There's also a reference in Joint Exhibit 1777. We could manage the closed-loop system without Coval's . . . if it wasn't for Coval's operation. There's testimony from a Mr. Townsend that the critical customer requirements for Coval states that the water level must be lowered to accommodate Coval's fines recovery operation. Townsend has references to that in Joint Appendix 1779-85, Joint Appendix 1490, Joint Appendix 1782, Joint Appendix 1491. And then there's a Mr. O'Brien that likewise says that Pinnacle understood that lowering the water level was crucial to Coval's operations. Otherwise, the contract is illusory. It makes no sense. So we believe that Judge Berger got it wrong, that you have to read into the contract the fact that they were going to maintain those permits and operate under the fence, which is what they agreed to do. We're entitled to all the justifiable inferences of that agreement at the summary judgment stage. We never got to make those arguments to a jury. We had not only an obligation, or a right to mine that property, we had an obligation. because it was for the mutual profit of both Coval and Pinnacle. And it was profitable until they said we aren't going to lower the water. And again, getting back to your question, Judge King, we believe that the selenium issue, which was their excuse for not lowering it, is a red herring. They had other alternatives. They employed other alternatives. The Tony Fork and Tilden Mines, one in West Virginia, one in Michigan. The Bar Report said it had another alternative. They just chose to do something else. Under West Virginia law, there's also the duty of good faith and fair dealing implied into every contract. And our court in the Buchanan-Upshur case cited in the- You have a stand-alone claim for violation of that though, can you, under West Virginia law, for violating the- No, you're absolutely right, that is not a stand-alone claim. How does it come into play in here? Well, I think it comes in because that again becomes a question of fact for the jury to decide whether or not they observed a reasonable commercial standard of fair dealing with us. That's the language from the case law in the Barn-Chestnut case. But in the Buchanan-Upshur case, our state Supreme Court held that that duty of fair dealing and good faith means that neither party will do anything which will injure the right of the other to receive the benefits of the agreement, period. That's a direct quote from that case. And Judge Copenhaver, in the Doyle decision that we also cite from the district court, says that the implied covenant of good faith, quote, merely directs attention to the party's reasonable expectations, unquote, period. We reasonably expected them to do what the mine permits told them to do and required them to do, and that is lower that water level. When they refused to do it, that put us out of business. The duty of good faith and fair dealing in that Barn-Chestnut case says that the issue is whether they observed a reasonable commercial standard of fair dealing with COVOL. Judge Berger, in her decision, says that the way they handled the selenium in the district court's opinion was reasonable under commercial standards. That's not the issue. It's not the issue whether they were reasonable in the way they handled selenium. The issue is whether they were reasonable in dealing with us and whether they had other alternatives besides the way they did it. Those are questions of fact that the trier of fact should have decided and not the court. We think that alone, that there's a clear issue of fact on whether or not what they did was reasonable regarding the selenium, and also she threw out the tort claims under the gist of the action theory. And she said that under the contract, there weren't any obligations for them to do anything with the water for COVOL. And then turned around in the opinion, said that because the tort claims arise under the contract, they're gone. You get the breach of contract claim back, you don't need any tort claims. That's exactly right. Yeah, that's exactly right. Your time's up. I've been an awful loser around here, David. I did reserve five minutes, Judge, for- You got your recursive time. Thank you, sir. Thank you very much. Mr. Downing? Good morning, Your Honor. Thank you. Good to have you here, Mr. Downing. It's a pleasure to be here, Your Honor. Thank you. May it please the court, good morning. My name is Tim Downing, and I'm here on behalf of defendant, I'm sorry, the Appley Pinnacle Mining Company, which I will refer to as Pinnacle. The argument that we just heard from Mr. Flaherty really is asking this court to do something quite remarkable. It's asking this court to rewrite a contract that was- Well, how about the right-of-way thing? You want a rewrite thing. You want to say the right-of-way stops at the water's edge. Actually, let's read what the right-of-way says in Section 18. And I don't, the characterization of that argument, I'm not sure is exactly right, but the right-of-way says what it says. And it really says that we will provide three things. If you'll just give me a moment to get there. It's Section 18, and it says the following. Quote, Pinnacle shall provide COVIL, one, a mutually agreeable area in the immediate vicinity of each fines pond that is adequate for COVIL to install and maintain its processing facility and equipment for recovery of refuse material. That's not the right-of-way. Two, any right-of-way reasonably needed by COVIL- To transport the refuse material from the ponds to the processing plant. Three, ingress and egress over the property. The right-of-way in this instance, Your Honor, even if it extends to the bottom of the pond, we did nothing to breach our obligation or our duty under Section 18. Reasonably necessary is in the right-of-way provision. You have to give them a right-of-way reasonably necessary. And we did that, Your Honor. We allowed them to get onto the top of the pond. The question would be whether reasonably necessary means you've got to lower the level of the water so they can get to these fines that you . . . refuse material, the coal fines that you sold them. And indeed, in order for the . . . That's what the question is. I mean, that . . . your 30B6 witness is pretty hard on you if you end up at trial. If we end up at trial, but you first have to find that this contract is ambiguous. Well, I know. That's right. Which . . . Well . . . And he finds you. What are you going to do with him? You throw over his testimony? No. His testimony stands. And his testimony actually does not . . . It says . . . says that he interprets the contract subject to the terms of the SIPRA. He doesn't say that I'm interpreting it in concern to my own interpretation. So, that testimony, frankly, does not hurt us, Your Honors. This contract is unambiguous. These are sophisticated companies. In fact, both of them are subsidiaries of Fortune 1000 Companies. They knew how to write an agreement, and they did it. What COVIL is trying to do here is to impose a duty on Pinnacle that it never bargained for. This Court has said over and over again that sophisticated parties know how to negotiate contracts, and that you cannot find an ambiguity simply because one party disagrees with the interpretation of the other. If you read . . . as I read in Section 18, Pinnacle agreed to do three things, and we did those things. We provided them a right-of-way. What we did . . . what we did never agree to do was to operate for them, and that's exactly what they're asking this Court to find that we had a duty to do, to operate for them. In addition, they assume the risks of operation in that department. If you go to Section 20, which Mr. Flaherty wants to ignore, it's a part of this contract. You have to look at this contract as a whole in interpreting it. You can't simply say, I'm not going to look at the whole thing. And under Section 20, it wasn't just a disclaimer of warranties as to the content of the material in the pond. It was a disclaimer as to the suitability of the pond itself for their operations. There was never a guarantee that they could operate in that pond, regardless of the level of the water. And indeed, that is . . . There's no definition of processing, right? There is no definition of processing. So you're reading Section 20 very expansively. I mean, you admit that. I mean, you have to, right? That's what the parties agreed to, Your Honor. Yes. Well, the parties agreed to use the word processing. But there's no agreement that you can point to between the parties as to the meaning of the word processing. Well, you can look at the agreement as a whole, Your Honor, and the intent of this agreement was that COVIL would operate and mine in the impoundment, and process the material in the impoundment. We had nothing to do with that. We never had any intention of doing that. But they got to dig it out of there to process it. And they could dig it out of there to process it. Not with the water level at it, where it was. Well, Your Honor, they could have done it, and they chose not to, because there's testimony in this case from one of their key witnesses, one of their chief executives, one of their executives, that said we could have solved the problem of the water level. The solution to the problem with the water level was buy a longer dredge. They decided not to do it. They were using a 25 or 26-foot dredge, and you said they could get one with a longer arm on it? Yes. I think it was 200 feet deep in some places. They never said anything about 200 feet. But that goes back to reasonableness, what they have to do to solve it. That goes back to get a jury to figure it all out. Reasonably necessary. Well, I think that you would have to find the contract to be on it. But then you got the mine plans that spell it out. The mine plans spell it out, and you got to comply with law. Those have the force and effect of law, correct? They do, Your Honor, but they're not ... Force and effect of law, and you all agreed you'd comply with the law as they apply here. Those specific plans relate to this thing. I used to practice law in West Virginia, and I was on a lot of different sides of these things. I know a little bit about mine plans, too. I may have stumbled on it. Why if the water ... lower than the water level was so important? Why didn't you all put that in the agreement? That's exactly right, Your Honor. It should have been in the agreement, and in fact, their witness who negotiated the deal said that ... It's in the mine plans. It's in the mine plans. Judge King, in the mine plans, but they are not our mine plans. I direct your attention ... They're mine plans that relate to this mine. But they were never specifically incorporated by reference into this agreement. You have to comply with the law. And we did comply with the law. Those are the law. And we were never cited by MSHA for not lowering the water level on the pond, and there's a reason, because we did ... Well, you didn't lower it. But they're arguing that we are ... You were going to be in trouble with the Selenium people if you lowered it. That's what it sounded like, and that's one of the reasons you didn't want to lower it. Your Honor, mine plans do not create contractual rights between parties, and that's what they're trying to say here. Selenium, was that the DEP, or the Office of Surface Mining, or the MSHA? Who was after you about the Selenium? Selenium was DEP, Your Honor. The DEP, that's Environmental Protection, because they didn't want that stuff getting out there and running down the Guyandot River. Do you know where this water goes? It goes into the Pinnacle Creek, Your Honor. And where does Pinnacle Creek go? I do not know that, Your Honor. Well, it's a matter of geography. Water runs downhill. I think it goes, I think part of Wyoming County goes to the Guyandot River, which takes it to the Ohio River, just right close to the Huntington, West Virginia water intake. But, and then it goes down the Ohio River. I mean, this is the headwaters of the Ohio River, is what you got here. The DEP has an interest in it, and I can understand why you'd be, you'd have concern about it. But, Mr. Flaherty says, well, that's just a red herring here, because they got bailed with the Selenium after we signed the agreement. It is not a red herring. I wouldn't lower the impoundment, because the authorities are going to get after them on the Selenium. It's not a red herring, Your Honor, because they specifically pled in their original complaint, that we negligently misrepresented what we were going to do on the Selenium. And for the reasons stated in our brief, that's simply impossible. And moreover, those claims are barred by the gist of the action doctrine, because all of the claims in this case arise out of the contract that these parties, these sophisticated business entities, negotiated with each other. It's a contract case, basically. It's a contract case. And again, to repeat, their chief negotiator said, if lowering the water level was, if Pinnacle was going to have a duty to lower the water level, it would be in the contract. And it's not. It is not, and they concede that. Well, it's in the mine plan. Well, but the mine. And you have a duty to, you have a duty to provide them, as reasonably necessary, with the right-of-way. With the right-of-way. And there's nothing in the agreement. You could have said, if you wanted to stop at the water's edge, you would have said, and this right-of-way stops at the water's edge. You didn't say that. You have to give them a right-of-way to the refuge material, most of which is at the bottom of the impoundment pond. And we did provide, and even assuming that is the case, Your Honor, we provided them that right-of-way. We did nothing to prevent them from doing that. And, indeed, the mine plan that you did. Well, that would be a question, in fact, for the jury, whether you reasonably provided them with the way to get them down. They said you had to lower the water level. Only if you first found. To let you down. I apologize. You all disagree. That's a disagreement, a disputed fact, of whether you did that or not. No, that's, well, you only get to that if you find this contract is unambiguous. I'm sorry, is ambiguous. Ambiguous. And it is not ambiguous. Ambiguous. I mean, on what the impound, of what the right-of-way provision means, they say it means one thing, and you say it means another. And if those, both of those constructions, and there are probably others, if both those constructions are reasonable, then it's ambiguous. But the question is, we did, as I stated, we did nothing to impede their ability to get to the confines. They had the ability to do it. They had a way to do it by buying a longer arm, and they chose not to. That's not our fault. That's their fault. See, that's an argument going to performance. That's not an argument on interpretation. Once you say it's ambiguous, then the performance issue is a fact question for the jury. You may well be right that they had the right to lower the water level themselves or to use a larger, a longer arm on the dredge or whatever it may be. But how are these not jury questions? These are not jury questions, Your Honor, because this is an unambiguous contract, as Judge Berger found. When you read this contract as a— You were the one that had to lower the water level. Well, we—the fact of the matter is the mine plan that you keep talking about, their own consultant who drafted the plan, and it's their plan, not ours, with respect to the mining of that impoundment. It says Covell shall lower the water level after each lift, not Pinnacle. And, in fact, nothing in that mine plan imposed a duty on Pinnacle to do anything with respect to water. And when you read the record, you will see that that's clear. Neither the 2002 plan that was in existence when these parties entered into this unambiguous contract or the 2010 so-called six-phase plan, that it does not impose a duty on Pinnacle to do anything with respect to the water. Indeed, Covell was identified as the party that was going to move the water out of the way, not Pinnacle. So there could—and that would also require, Your Honors, for that mine plan to be incorporated by reference into this agreement. And there are very strict rules in this circuit as to when that's going to—or how that happens. I mean, as this court no doubt knows. Isn't that the effect of Section 7 and 8 necessarily? That it be—no, it is not, Your Honor. That you comply with the permits, the rules, the regulations, the laws? That's all part of the mine plan. To comply with the rules of the government but not a private right of action by a party who's trying to enforce that. No, no, the private right of action here arises under the SIPRA. Everybody agrees with that. But it doesn't have to be explicitly incorporated by reference if a fair reading of Section 7 and 8— and by the way, Judge Berger didn't even mention Section 7. Well, she— That may have been because Covell didn't mention Section 7 in their briefing. I couldn't find it in their memorandum. But it's clear that— It can't just automatically incorporate something by reference under the law of the state of West Virginia. Under the holding of the U-Haul Company of West Virginia v. ACAB case from 2013, in order to incorporate something by reference, the writing must make a clear reference to the other document so assent by both parties is unmistakable. Writing must describe the other document so its identity may be ascertained beyond doubt. It must be certain that the parties had knowledge of and assented to the incorporated document. Section 8 of this contract, which is the section that they cite in their brief and which they claim we had a duty under which to lower to—that is incorporated by reference, does not say anything about the permit plan. What's unclear about, quote, both parties agree to comply in all respects with any and all laws, orders, mandates, and other governmental requirements? There's nothing unambiguous about—and we did that. We have never been cited by MSHA with respect to anything in the water, water level or anything else. So we complied with the law. What they're trying to do is impose a contractual duty on us that's outside of what was intended there, which was the law of the United States of America or the state of West Virginia with respect to environmental regulations and say that somehow the plan that their consultant prepared became part of this contract. Remember, this—the six days— It goes on in that section 7, and then it specifically identifies a whole bunch of laws, regulations. They talk about the governmental requirements. But it does not— They talk about the surface mining law, the resource conservation law, the federal mine safety laws. I mean, that's what these plans come from. But does not specifically identify by permit number or any other way what the mine plan at issue here. And Judge Berger pointed that out in her opinion. And remember, the purpose of a mine plan is not to provide a contractual right to a party. Under 30 United States Code Section 801G, a purpose of a mine plan is, quote, to protect the health and safety of the nation's coal or other miners, end quote. It is not intended to provide a contractual right to a party. And again, there's been no MSHA citation for not lowering the water level. And neither plan, as I said, imposed the duty on Pinnacle to lower the water, ever. And keep in mind this, the six-phase plan that they want to incorporate by reference into this contract, it didn't exist when this contract was entered into. It was not even prepared by their consultant until November of 2008. Under that Section 7, I'm not sure it has to exist. Yeah, why does it have to exist at all? To incorporate something by reference, it seems to me by definition, the contract you want to incorporate has to exist first. It has to comply with everything, from the federal, state, and local government, agency, courts, public authority, relating to environmental pollution, environmental control, safety, labor, et cetera, et cetera. Governmental requirements. Both of you had that obligation. Well, we had the obligation. We both had the obligation, and we in fact – Both had the obligation under Section 7. Not with all of it. And we in fact complied with Section 7. We never were cited with respect to anything related to this so-called mine plan, ever. So, Your Honor, this mine plan did not become part of this contract. By their admission, there's nothing in the contract that specifically says that it imposes a duty on Pinnacle to lower the water level in the pond, and nor could there be. Because, as I said before, there's other sections where they had obligations. They had the obligation to mine the pond at their own expense, and without interrupting our operations. And Section 10 says that our operations are superior to theirs. Because, remember, this impoundment was, for our purposes, a waste receptacle. Always what? It was a waste receptacle. It's to expel our waste from our underground mine into a receptacle. It's also an income stream for you. We don't get any income from this impoundment. After they left, we – You got income from the removal of the refuse material. At times we did. We sold them the refuse material, and they processed it and sold it. At times we did. At all times. Before they walked off the job. And let's talk about that Section 12 of the contract, too. Because, again, looking at the contract as a whole, which this Court says must be the case, Section 12 gives them the right to walk away if it became economically unfeasible for them to operate. And so when you read Section 4, when you read Section 8, when you read Section 18, and you read Section 28, the integration clause, you look at the contract as a whole. And there's a whole – under Section 20, since they had – all warranties were disclaimed with respect to the content of the material and the suitability of the impoundment pond. Why? Because they knew going in there was no guarantee that they would be able to mine in that pond, that the content – what the content would be now or in the future. And as a result, we said, okay, we'll give you the right to walk away in Section 12. And that's what they did. And you also gave them a right of access. We gave them a right of way to get to the material. A right of way. And we, in fact, did provide them the right of way to get to it. As reasonably necessary. And we did nothing to get in their way of mining in that impoundment. And, in fact, from 2010, from the adoption of the so-called six-phase plan until they walked off the job, they continued to operate in that pond. They simply refused. Could an omission be an impediment? An omission cannot be an impediment. That's a good answer. I thought that was the answer you would give. It has to be. For your argument to work, you have to answer that way, right, that you had no obligation and any omission in the performance of the contract could not give rise to a breach. That's correct, Your Honor, and that's the law of West Virginia. Well, that may be the law of West Virginia in some respects, but I'm not reading this contract that way. This thing's got a lot of moving parts. It would have been a remarkable feat of legal draftsmanship to have crafted this thing without any ambiguities. I'm not saying it couldn't have been done, but to say that this thing is not ambiguous is, I think, asking too much of it. Well, Your Honor, with all due respect, I disagree, as did Judge Berger, and she found, after looking at all the evidence presented, that there was no ambiguity in this contract because simply because a party . . . We would never review that decision to know, though. I mean, we give district judges deference in a lot of instances, but not on a reading of this contract. Understood, Your Honor, but . . . No vote review. But the fact of the matter is this . . . If it's ambiguous, if any relevant part of it is ambiguous, then you've got to have a trial. You can present evidence and the jury can figure it out what you all meant. And this contract is not ambiguous. I know. If you say it's not ambiguous, we ought to affirm Judge Berger, and maybe we will. Mr. Flaherty is also a very good lawyer. He says it is ambiguous, and he's entitled to a trial. How many mines, the underground mines you all got up here dumping in this place? Just the one, just Pinnacle Mine. Pinnacle Mine. What's the closest town to it? Pinnacle. Pinnacle, West Virginia. What's the closest town that's incorporated? I don't . . . Angle? Mullins? I'm not . . . Island? Where is it? It's about 30, 40 minutes from Beckley. All right. South of Beckley, I know. That's where Wyoming County is. Yes. I'm trying to find out where it is in Wyoming County. So it's . . . I believe . . . I could look at the map, I guess, but I figured you'd know. Yeah. You own the mine. I know it's near Beckley, and I know it's about an hour from Beckley. But given . . . South of Beckley. . . . the topography there, I'm not north, south, east, and west. It's really hard for me to figure out down there. The Pocahontas scene? Yes. Pocahontas number three? That's correct. I see that my time is up, Your Honors. If I could simply conclude by saying this . . . That's the best coal in the world. Indeed it is. No mining out of there. Indeed it is. But it doesn't float. But it doesn't float. It goes to the bottom of the impoundment. How long have you all been dumping that stuff in there? The U.S. Steel started using that, built that . . . U.S. Steel had the mine? In 1970. And then we purchased it from one of their predecessors in 2007. Okay. Allow me to close simply by saying this. Go right ahead. The district court accurately described this part, this relationship, as their strategic business alliance. These two subsidiaries of a Fortune 1000 company spelled out the terms of their alliance, and those terms did not include an obligation or a duty on the part of Pinnacle to adjust water level in the impoundment pond for Covill. That's what this case boils down to. Covill wants this court to impose a duty on Pinnacle that it never bargained for. For all the reasons set forth in our brief, and as argued here today, this court should affirm the judgment of the district court because a failure to do so would render contracts entered into between sophisticated parties meaningless. Thank you, Your Honors. Thank you, sir. Appreciate it. Mr. Flaherty? Thank you, Your Honor. This court has said, and it's been the law since 1993, that a contract is ambiguous if, quote, it is reasonably susceptible to different meanings. If it's reasonably susceptible to different meanings. Sounds like Justice Davis views it, at least arguably, with a different meaning than Covill. We view it differently than Pinnacle. Pinnacle says it didn't have an obligation to lower the water. We believe they do under the mine plans. Judge Floyd, you indicated why didn't we put that in there. We believe that it is in there because otherwise if we did not have access to the coal, then the contract, I mean, it's illusory. We spent $20 million to go in here to buy the property, to do the upgrades, and then they're going to say, well, we never told you you had access to the coal, and that's the effect of Judge Berger's ruling. The issue is whether we have access. She says that the contract doesn't give us access to the coal. If that's the case, then the contract, I mean, it just doesn't make any sense at all. Judge Davis, I think you hit the nail on the head on the various issues of fact here, and there are a bunch of them. The issue of whether or not they had an alternative for how they managed selenium, that's an issue of fact. They say they didn't. We say that they did, and we just never got to put on that evidence. That's something that the trier of fact should have sorted out. They say we should have used a longer dredge arm. Our evidence would have been that that would have been dangerous, that you couldn't do it, plus the mine plan itself specifically provides. 425, 26 footer. Yes, sir. Dredging operation shall, mandatory word shall, be conducted in lifts equal to the dredging depth of the dredge on site, typically 25 and 30 feet. Section 7, and I'm reading from Joint Appendix 2014, paragraphs 1 and 7. Paragraph 7, upon the completion of a dredging, of dredging a layover lift, the pool level shall be lowered to accommodate dredging of the next lift. Mine plan is that. It's Pinnacle's plan. I mean, it's Pinnacle's mine. It governs their mining operations. There are two mine plans. One was the Beard plan, and if you recall from the briefs, Pinnacle had an agreement with a company called Beard. Beard Pinnacle, LLC, mined this before Cobol. Yes, sir. And they mined it under that plan, under the Beard plan. The second plan was the six-phase plan that came into effect, I think, in, I mean, it was after the contract. But both of them specifically provide for mining in 25-foot layers or lifts, and both of them specifically provide for a 25-foot dredge arm. We can't change that. But at best, that is an issue of fact on whether we could or we couldn't for the jury to determine. They rely heavily, as did Judge Berger, on the incorporation by reference issue, Judge Floyd, that you have mentioned, and they rely on the state XRO-U-Haul versus Judge Zacaib, which was a decision of the state Supreme Court that came down around Thanksgiving of 2013, long after we ran into problems with this operation on what is or is not incorporated. And in that case, Judge Berger said, well, we didn't incorporate the mine plan. So we're along the same lines that you're questioning, Judge Floyd. That case is clearly distinguishable by what we have here, and, in fact, the Fourth Circuit rule specifically provides, about the same time the state Supreme Court was dealing with what incorporation by reference means, this court in Logan and Kanawha Coal Sales, Logan and Kanawha's coal versus, I think it's Drethridge Coal, said this, and I quote, the court is particularly willing to find incorporation by reference where the parties are familiar with a secondary documented issue due to the ongoing business relationship or course of dealing. That is clearly the case here. There are references throughout the documents, throughout the joint appendix. Judge King, you are absolutely correct. The 30B-6 deposition testimony of William Boer specifically talks about the intent of the parties to allow us to have access to that coal by them lowering the water. I thought I heard Mr. Downing say that we could have lowered the water. That is simply not the case. This was their infrastructure, their piping, their impoundment. What we had a right to do was to mine it. We had no ability or right to go in there and lower the water ourselves. If we did, we wouldn't be here. They refused to lower it and prohibited us from doing it. You know, that incorporation by reference issue I think would be a great law school exam under Erie v. Tompkins. Is that a procedural matter or is that a substantive state law matter? But it sure does lend itself to a good argument. I hadn't thought of that, Justice Davis, but it's clearly distinguishable even factually. When you look at what was happening in the U-Haul case, U-Haul was incorporating an addendum to the contract they called an arbitration clause without the parties ever seeing it. And the plaintiffs in U-Haul v. Acabe, none of them signed it, and most of them are on record as saying, we never even saw it, we didn't know there was an arbitration clause in there. And the court says you've got to go through these various procedures. That's when U-Haul, if you rent a truck from them, you give up your right to go to court. That was U-Haul's position. The Supreme Court disagreed. It would turn on the arbitration clause. Right, but you have to have an arbitration clause in there. But it also, in U-Haul, in Judge Berger's order referring to the U-Haul case, she says that Who wrote that opinion you cited there for 4th Circuit? I don't know, Judge. I can give you the cite to it. Well, that's all right. But what it is is kind of common sense. It is. The parties know what they're doing. It is a 514 Fed Appendix 365, 4th Circuit, 2015. Well, that's an unpublished opinion. That doesn't help you much. But it's particularly saying that It's common sense, it sounds like. I mean, if the parties are familiar with the other agreement, and clearly they are here, then the intent of the parties is to abide by it. And that's where you get into the extrinsic evidence because the contract is ambiguous. There was one other point here. Oh, the water system, Judge. Actually, as I understand the engineering of it, this water would not have gone into, under the Clean Water Act, into some other stream. As I understand it, it would have come out of the impoundment being mined into a towpond and then put back into an underground storage. And it was sort of a loop system. It was never going to get into the Gandot River or into the waters of the United States? Well, I think the intent was they didn't want it to. Oh, okay. Thank you very much, Mr. Clarity. We'll come down and greet counsel and adjourn court until 8.30 tomorrow morning. This honorable court stands adjourned until tomorrow morning at 8.30. God save the United States and this honorable court.
judges: Robert B. King, Henry F. Floyd, Andre M. Davis